761 So.2d 279 (2000)
Stanley SHADLER, Petitioner,
v.
STATE of Florida, Respondent.
No. SC93784.
Supreme Court of Florida.
January 6, 2000.
Rehearing Denied February 28, 2000.
*280 Kevin R. Monahan, Palatka, Florida, for Petitioner.
Robert A. Butterworth, Attorney General, and Rebecca Roark Wall, Assistant Attorney General, Daytona Beach, Florida, for Respondent.
ANSTEAD, J.
We have for review State v. Shadler, 714 So.2d 662 (Fla. 5th DCA 1998), which expressly and directly conflicts with the opinion in Bruno v. State, 704 So.2d 134 (Fla. 1st DCA 1997). We have jurisdiction. See art. V, § 3(b)(3), Fla. Const. For the reasons that follow, we quash the decision in Shadler and find that the exclusionary rule applies to an error committed by the Florida Department of Highway Safety and Motor Vehicles through its Division of Driver Licenses.

PROCEEDINGS TO DATE
On June 18, 1997, Deputy Gary Bowling received information from a fellow police officer that petitioner Stanley Shadler's license had been suspended. He subsequently verified this information through his dispatcher. About two hours later, Bowling stopped Shadler on the basis of the information received from the other officer and the dispatcher. At the stop, Bowling performed a computerized check through the Department of Highway Safety and Motor Vehicles, Division of Driver Licenses, which confirmed that Shadler's license had been suspended. In fact, however, as the parties agree, Shadler's license had not been suspended and the information relied upon by Bowling was in error. Relying upon the erroneous information, Bowling arrested Shadler for driving with a suspended license and searched him incident to that arrest. During the search, Bowling found contraband in a plastic bag inside Shadler's wallet. Bowling then charged Shadler with unlawful possession of the contraband.
After his arrest, Shadler went to the "Motor Vehicle Bureau" to inquire why his license was reported suspended. There, an examiner told him that the mistaken information was due to a computer error *281 and that his license was not suspended.[1] Before trial, Shadler filed a motion to suppress the fruits of the search, claiming that the arrest and search incident to that arrest were unlawful because they were predicated upon an erroneous belief that his license had been suspended. At the hearing, Shadler argued that the Division of Driver Licenses should be treated as a law enforcement entity because it is part of the Department of Highway Safety, which is also the parent department of the Florida Highway Patrol. Therefore, under the rule in State v. White, 660 So.2d 664 (Fla.1995), the contraband should be excluded.
The trial court granted the motion, reasoning that the Department of Highway Safety's failure, through its driver's license division, to keep its records accurate and current was a mistake attributable to a law enforcement agency of the government. On appeal, the Fifth District reversed, and, focusing solely on the duties of the Division of Driver Licenses of the Department of Highway Safety, held that persons working for the Division should be treated as the court employees in Arizona v. Evans, 514 U.S. 1, 115 S.Ct. 1185, 131 L.Ed.2d 34 (1995), and, therefore, the mistake should not be attributed to a law enforcement agency. See Shadler, 714 So.2d at 663.
Shadler sought review in this Court based on conflict with Bruno v. State, 704 So.2d 134 (Fla. 1st DCA 1997). In Bruno, an officer stopped the defendant, Bruno, for speeding and, upon verifying his license "over the radio," the officer was erroneously advised that the license had been suspended. As a result, the officer arrested Bruno. In a search incident to that arrest, the officer discovered contraband on Bruno's person. At trial, the judge denied Bruno's motion to suppress. The First District reversed, finding that "[b]ecause the police information failed to support a legal arrest, the evidence seized as a result of the arrest should have been suppressed and the [trial] judge erred in denying the defense's motion for same." Id. at 135.

APPLICABLE LAW
The parties agree that this case is generally controlled by the rule of law enunciated in Arizona v. Evans, 514 U.S. 1, 115 S.Ct. 1185, 131 L.Ed.2d 34 (1995), and State v. White, 660 So.2d 664 (Fla. 1995). Pursuant to Evans, if an error leading to an unlawful arrest and a subsequent search and seizure was made by court personnel, then the exclusionary rule will not apply and the evidence obtained can be used against the accused. See Evans, 514 U.S. at 14, 115 S.Ct. 1185. In White, we ruled that if the error causing the arrest is attributable to law enforcement personnel, then the seized evidence must be suppressed under the exclusionary rule. See White, 660 So.2d at 667. However, neither Evans nor White contained a broad analysis covering all governmental entities and their mistakes.

Arizona v. Evans
In Evans, the defendant was stopped by the police for a routine traffic violation. See 514 U.S. at 4, 115 S.Ct. 1185. When the officer checked the defendant's driver's license using a computer data terminal in his patrol car, the information returned erroneously reported that the defendant's license had been suspended and that there was an outstanding misdemeanor warrant for his arrest. See id. Immediately, the officer arrested the defendant. See id. In a search incident to the arrest, the officer found contraband under the passenger's seat of the defendant's car. See id.
At a suppression hearing, it was discovered that the "clerk of the court" failed to notify the Sheriffs Office that the warrant had been quashed. See id. The Arizona *282 Supreme Court agreed that the evidence should be suppressed. On review, the U.S. Supreme Court reversed and in a seven-to-two decision, narrowly limited its holding as to the application of the exclusionary rule to errors committed by court personnel. Reasoning that "court clerks are not adjuncts to the law enforcement team engaged in ... ferreting out crime [and] have no stake in the outcome of particular criminal prosecutions," the Court found that application of the exclusionary rule in these circumstances would have no significant effect on court employees responsible for informing the police that a warrant has been quashed. Id. at 15. Several concurring justices emphasized in separate opinions that the Evans holding was strictly limited to errors by court personnel. Justice Souter, for example, noted:
[W]e do not answer another question that may reach us in due course, that is, how far, in dealing with fruits of computerized error, our very concept of deterrence by exclusion of evidence should extend to the government as a whole, not merely the police, on the ground that there would otherwise be no reasonable expectation of keeping the number of resulting false arrests within an acceptable minimum limit.
Evans, 514 U.S. at 18, 115 S.Ct. 1185 (Souter, J., concurring).

State v. White
A few months after the decision in Evans, this Court was presented with a similar issue involving erroneous reliance upon a reported warrant in which the error leading to the arrest was committed by personnel working in a police department. See White, 660 So.2d at 666. The basis for the erroneous report on the status of the warrant in White was a computer error "in the Sheriff's Office." Id. at 665-66. In our decision, we recognized that Evans had not spoken directly to the question of whether the exclusionary rule should apply when the error leading to the unlawful arrest was attributable to law enforcement or other executive branch agencies. See id. at 666.
We concluded that the error was "within the collective knowledge of the sheriff's office" and could not serve as the proper basis for a lawful arrest. Id. at 668. We further found that the failure of the police to maintain accurate and updated records fit into the category of conduct meant to be covered by the exclusionary rule. See id. at 667. Specifically, we stated that "[s]uppression of evidence seized pursuant to police computer error will encourage law enforcement agencies to diligently maintain accurate and current computer records." Id. In approving the application of the exclusionary rule, the opinion cited with approval the automation error concerns expressed by the Arizona Supreme Court:
It is repugnant to the principles of a free society that a person should ever be taken into police custody because of a computer error precipitated by government carelessness. As automation increasingly invades modern life, the potential for Orwellian mischief grows. Under such circumstances the exclusionary rule is a "cost" we cannot afford to be without.
Id. at 667-68 (quoting State v. Evans, 177 Ariz. 201, 866 P.2d 869, 872 (1994), rev'd, 514 U.S. 1, 115 S.Ct. 1185, 131 L.Ed.2d 34 (1995)).

FUNCTION OF THE DEPARTMENT OF HIGHWAY SAFETY
The Department of Highway Safety is a large component department of Florida's executive branch. On its internet web page, the following "Overview" of its function is presented:
At the Department of Highway Safety and Motor Vehicles (DHSMV), we come into contact with nearly every Floridian. People visit our offices to get a driver license to operate their vehicles. They come to us to register and title these same vehicles. They may receive assistance *283 from the Florida Highway Patrol when their vehicle breaks down along Florida's highways or be reminded to slow down and buckle up.
But there is more to DHSMV than meets the eye. Our mission is making highways safe through service, education and enforcement.
More than 5,000 people around the state are dedicated to accomplishing this mission in more ways than most people know. You may be surprised by some of the duties department members perform.
Florida Department of Highway Safety & Motor Vehicles, Overview (visited December 20, 1999) . Additionally, the Department of Highway Safety describes its mission as follows: "[promoting] a safe driving environment through law enforcement, public education and service, reduction of traffic crashes, titling and registering of motor vehicles and vessels, licensing motor vehicle operators, and regulat[ing]... motor vehicle exhaust." Florida Department of Highway Safety & Motor Vehicles, Quarterly Report, July-September 1999Mission Statement. Also, the following are among the listed goals of the Department of Highway Safety: (1) to "provide the most effective highway safety and enforcement programs through the use of appropriate traffic and criminal law enforcement ..."; (2) to "provide administration and management to meet the challenge of highway safety and support the headquarters and field activities of the department"; and (3) to "provide assistance to local, state, and federal agencies and highway safety organizations through a comprehensive records and management information system which reflects driver and vehicle status and traffic crash information." Florida Department of Highway Safety & Motor Vehicles, Goals (visited December 20, 1999) (emphasis added) (citations omitted).
To effectuate these interrelated goals, the Department is organized into four divisions.[2] Two of these divisions, the Highway Patrol and the Division of Driver Licenses, account for nearly three-quarters of the Department's staff.[3]See Florida Highway Patrol, Overview (visited December 20, 1999) . The larger of the two, the Highway Patrol, represents 45% of the total staff. See Florida Highway Patrol, Overview (visited December 20, 1999) 
While each division is supervised by a separate director and has its own organizational structure, see Fla. Admin. Code R. 15-1.003-.006, the Department as a whole is subject to section 20.05(1), Florida Statutes (1997), which provides:
Each head of a department, except as otherwise provided by law, must:
(a) Plan, direct, coordinate, and execute the powers, duties, and functions vested in that department or vested in a division, bureau, or section of that department; powers and duties assigned or transferred to a division, bureau, or section of the department must not be construed to limit this authority and this responsibility. ...
*284 Moreover, section 321.05, Florida Statutes (1997), gives broad law enforcement powers to "[t]he [highway] patrol officers under the direction and supervision of the Department of Highway Safety and Motor Vehicles," § 321.05, Fla. Stat. (1997) (emphasis added). Accordingly, because the Department of Highway Safety is charged with law enforcement both in fact and by law, we conclude that it is clearly a law enforcement agency.
As noted above, the Department of Highway Safety not only considers itself a major law enforcement agency, but it has specifically articulated as one of its three major goals the following: "Provid[ing] assistance to local, state, and federal agencies and highway safety organizations through a comprehensive records and management system which reflects driver and vehicle status information." Hence, it is apparent that the Department itself recognizes the critical role the Division of Driver Licenses plays in law enforcement. Since its inception, one of the primary responsibilities of the Department's driver's license division has been to create and maintain a permanent record for every licensed driver, including the recording of revocations, suspensions, disqualifications, convictions, crashes and other driving history information. See § 322.20, Fla. Stat. (1997). In fact, much of the information comes from the Highway Patrol and other law enforcement agencies. See Fla. Admin. Code R. 15-1.004(4)-(6). The Department estimates that in the 1998-1999 fiscal year, the Division of Driver Licenses will process over 15,400,000 driver records, including roughly 85,000 license revocations and more than 919,000 suspensions. See Florida Department of Highway Safety & Motor Vehicles, Driver License Facts & Figures (visited December 20, 1999) .
Of course, the maintenance of records of revocations and suspensions clearly relate directly to the enforcement of the laws relating to driving privileges. More importantly, however, as the State conceded at oral argument, every law enforcement agency in the state, from the Highway Patrol to the smallest municipal police department, relies on the division's records to verify driver's licenses and their current status in order to enforce the law. Accordingly, not only is the division an integral part of the Department of Highway Safety and its overall mission, but in terms of reliance upon the accuracy of its records, it is a vital part of the law enforcement infrastructure of the entire State of Florida.[4]

APPLICATION OF EVANS AND WHITE

Our constitution requires that search and seizure rights "shall be construed in conformity with the Fourth Amendment to the United States Constitution, as interpreted by the United States Supreme Court." Art. I, § 12, Fla. Const. In this vein, we recognize that the United States Supreme Court has stated that the exclusionary rule is a "judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect." United States v. Calandra, 414 U.S. 338, 348, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974). As noted, we expressed the view in White that "[i]t is repugnant to the principles of a free society that a person should ever be taken into police custody because of a computer error precipitated by government carelessness." White at 667 (quoting State v. Evans, 177 Ariz. 201, 866 P.2d 869, 872 (1994), rev'd, 514 U.S. 1, 115 S.Ct. 1185, 131 L.Ed.2d 34, (1995)). In this regard we find ourselves in agreement with the views expressed by Justice *285 O'Connor (and joined in by two of her colleagues) in Evans:
In recent years, we have witnessed the advent of powerful, computer-based recordkeeping systems that facilitate arrests in ways that have never before been possible. The police, of course, are entitled to enjoy the substantial advantages this technology confers. They may not, however, rely on it blindly. With the benefits of more efficient law enforcement mechanisms comes the burden of corresponding constitutional responsibilities.
Evans, 514 U.S. at 17-18, 115 S.Ct. 1185, (O'Connor, J., concurring). Based upon our analysis of the duties and responsibilities of the Department of Highway Safety as set out above, we conclude that the Department, including its driver's license division, is essentially a law enforcement agency, and that our holding in White should apply.
We reject the invitation of the State to focus solely on the work of the Division of Driver Licenses. We cannot focus solely on the internal subdivisions of the Department of Highway Safety any more than we can focus solely on the internal subdivisions of any large law enforcement agency in assessing its accountability and protecting our citizens from unlawful arrests due to agency mistakes. While a record keeping clerk in a sheriff's office may be absolutely devoted solely to his own work, that makes him no less a part of the sheriff's office and subject to its management and control. So, too, with a division of the Department of Highway Safety. Moreover, we conclude that if the exclusionary rule is not applied to evidence secured due to the division's mistakes, neither the Department of Highway Safety nor its driver's license division will have an incentive to maintain records current and correct.[5] By applying the rule it will be clear that there is a visible consequence to the mistake and the mistake will not simply be overlooked.
Further, and clearly unlike the court personnel in Evans, we conclude that at the very least the employees of the Division of Driver Licenses are "adjuncts to the law enforcement team" in the Department of Highway Safety. Accordingly, the operation of the exclusionary rule in this context does not, as the State would suggest, serve to "punish" police for their "reasonable reliance" upon the mistake of some wholly separate and independent agency completely unconnected to law enforcement. We have already discussed the many law enforcement roles of the Department of Highway Safety and its divisions, and their close relationships. In addition, the information maintained and provided by the Department through its divisions is used in virtually every traffic stop effectuated by the police: thus it affects every Florida citizen using the state's roads. Since the Department processes over 1,000,000 license suspensions and revocations each year, even a slight error rate puts thousands of Florida's citizens at risk of unlawful arrests and subsequent seizures.
Finally, and of greatest importance, we conclude that the exclusion of evidence in cases such as the one at bar will surely serve to encourage accurate record-keeping of driver's license information. The exclusionary rule is perhaps the only means by which the judiciary can help to ensure the accuracy of records and information compiled by the Department of Highway Safety and its divisions that routinely provide records to Florida's police and sheriffs' departments. Because the Department of Highway Safety is responsible for the related law enforcement functions of agency record-keeping and monitoring *286 traffic offenses and crime on the state's highways, there is an institutional obligation as well as a direct mechanism for feedback from fellow employees to communicate the effect of the exclusionary rule. Surely, the Department of Highway Safety, above all others, will consistently strive to see that no mistakes are made and that no citizen is wrongfully subjected to an arrest or search predicated upon a mistake. That is, after all, the net effect of our ruling, to recognize that the government had no right, because of a mistake by the Department of Highway Safety, to seize and search one of its citizens. In the end, the government is discouraged from making such mistakes, and is only deprived of what it had no right to in the first instance.

CONCLUSION
Therefore, because the Department of Highway Safety is an executive branch agency and is an integral part of law enforcement in the State of Florida, and because operation of the exclusionary rule in this case should have a significant effect upon the Department's record-keeping efforts, we find that the error made here is a "law enforcement" error under White. Accordingly, we quash the district court's decision and find that the trial court correctly excluded the evidence obtained during the unlawful search, and in so doing, we approve Bruno to the extent it held that a similar computer error is a law enforcement error for purposes of the exclusionary rule.
It is so ordered.
SHAW, PARIENTE and LEWIS, JJ., concur.
WELLS, J., dissents with an opinion, in which HARDING, C.J., and QUINCE, J., concur.
WELLS, J., dissenting.
I dissent for the following reasons.
First, this Court has no jurisdiction. There is no conflict between the Fifth District's decision in this case and the First District's decision in Bruno v. State, 704 So.2d 134 (Fla. 1st DCA 1997). There is not one mention of the Florida Department of Highway Safety and Motor Vehicles or the Division of Driver Licenses in Bruno. If this Court does have conflict jurisdiction, it is Bruno which should be quashed for not expressly recognizing that the reach of State v. White, 660 So.2d 664 (Fla.1995), is limited to the law enforcement arresting agency. This is the only way that White can conform with the United States Supreme Court's decisions in Arizona v. Evans, 514 U.S. 1, 115 S.Ct. 1185, 131 L.Ed.2d 34 (1995), and United States v. Leon, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984).
Second, though stating that it recognizes the directive of article I, section 12 of the Florida Constitution, the majority avoids the requirement that our search and seizure applications comply with the decisions of the United States Supreme Court. Reflective of this avoidance of the requirement is the majority's reliance on only the concurring opinions in Evans and on a 1974 opinion concerning the exclusionary rule in United States v. Calandra, 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974), and the majority's total omission of any reference to or quotation from Chief Justice Rehnquist's majority opinion in Evans and any reference whatsoever to the 1984 seminal opinion concerning the exclusionary rule in Leon, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). It is Leon which is discussed extensively in the majority opinion in Evans.
As Judge Sharpe correctly recognizes in the Fifth District opinion, the exclusionary rule in this context only excludes evidence which "stems from police or law enforcement employees" unless there is some showing of bad faith reliance by such law enforcement employees. The following from the majority opinion in Evans makes this crystal clear:

*287 The Fourth Amendment states that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized." We have recognized, however, that the Fourth Amendment contains no provision expressly precluding the use of evidence obtained in violation of its commands. "The wrong condemned by the [Fourth] Amendment is fully accomplished' by the unlawful search or seizure itself," and the use of the fruits of a past unlawful search or seizure "`work[s] no new Fourth Amendment wrong,'" Leon, supra, at 906, 104 S.Ct. 3405 (quoting Calandra, supra, at 354, 94 S.Ct. 613).
"The question whether the exclusionary rule's remedy is appropriate in a particular context has long been regarded as an issue separate from the question whether the Fourth Amendment rights of the party seeking to invoke the rule were violated by police conduct." Illinois v. Gates, 462 U.S. 213, 223, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983); see also United States v. Havens, 446 U.S. 620, 627-628, 100 S.Ct. 1912, 64 L.Ed.2d 559 (1980); Stone v. Powell, 428 U.S. 465, 486-487, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976); Calandra, supra, at 348, 94 S.Ct. 613. The exclusionary rule operates as a judicially created remedy designed to safeguard against future violations of Fourth Amendment rights through the rule's general deterrent effect. Leon, supra, at 906, 104 S.Ct. 3405; Calandra, supra, at 348, 94 S.Ct. 613. As with any remedial device, the rule's application has been restricted to those instances where its remedial objectives are thought most efficaciously served. Leon, supra, at 348, 104 S.Ct. 3405. Where "the exclusionary rule does not result in appreciable deterrence, then, clearly, its use ... is unwarranted." United States v. Janis, 428 U.S. 433, 454, 96 S.Ct. 3021, 49 L.Ed.2d 1046 (1976).
In Leon, we applied these principles to the context of a police search in which the officers had acted in objectively reasonable reliance on a search warrant, issued by a neutral and detached Magistrate, that later was determined to be invalid. 468 U.S., at 905, 104 S.Ct. 3405. On the basis of three factors, we determined that there was no sound reason to apply the exclusionary rule as a means of deterring misconduct on the part of judicial officers who are responsible for issuing warrants. See Illinois v. Krull, 480 U.S. 340, 348, 107 S.Ct. 1160, 94 L.Ed.2d 364 (1987) (analyzing Leon, supra). First, we noted that the exclusionary rule was historically designed "`to deter police misconduct rather than to punish the errors of judges and magistrates.'" Krull, supra, at 348, 107 S.Ct. 1160 (quoting Leon, supra, at 916, 104 S.Ct. 3405). Second, there was "`no evidence suggesting that judges and magistrates are inclined to ignore or subvert the Fourth Amendment or that lawlessness among these actors requires the application of the extreme sanction of exclusion.'" Krull, supra, at 348, 107 S.Ct. 1160 (quoting Leon, supra, at 916, 104 S.Ct. 3405). Third, and of greatest importance, there was no basis for believing that exclusion of evidence seized pursuant to a warrant would have a significant deterrent effect on the issuing judge or magistrate. Krull, supra, at 348, 107 S.Ct. 1160.
The Leon Court then examined whether application of the exclusionary rule could be expected to alter the behavior of the law enforcement officers. We concluded:
"[W]here the officer's conduct is objectively reasonable, `excluding the evidence will not further the ends of the exclusionary rule in any appreciable way; for it is painfully apparent that... the officer is acting as a reasonable *288 officer would and should act in similar circumstances. Excluding the evidence can in no way affect his future conduct unless it is to make him less willing to do his duty.'" Leon, supra, at 919-920, 104 S.Ct. 3405 (quoting Stone, supra, at 5349-540, 96 S.Ct. 3037 (White, J., dissenting)).

See also Massachusetts v. Sheppard, 468 U.S. 981, 990-991, 104 S.Ct. 3424, 82 L.Ed.2d 737 (1984) ("[S]uppressing evidence because the judge failed to make all the necessary clerical corrections despite his assurances that such changes would be made will not serve the deterrent function that the exclusionary rule was designed to achieve"). Thus, we held that the "marginal or nonexistent benefits produced by suppressing evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant cannot justify the substantial costs of exclusion." Leon, supra, at 922, 104 S.Ct. 3405.
Arizona v. Evans, 514 U.S. at 10-11, 115 S.Ct. 1185 (emphasis added) (citations omitted). The Evans court then, in reversing the Supreme Court of Arizona's application of the exclusionary rule to a mistake made other than by the arresting law enforcement agency, said:
This holding is contrary to the reasoning of Leon, supra; Massachusetts v. Sheppard, [468 U.S. 981, 104 S.Ct. 3424, 82 L.Ed.2d 737 (1984)], and Krull, supra. If court employees were responsible for the erroneous computer record, the exclusion of evidence at trial would not sufficiently deter future errors so as to warrant such a severe sanction. First, as we noted in Leon, the exclusionary rule was historically designed as a means of deterring police misconduct, not mistakes by court employees. See Leon, supra, at 916, 104 S.Ct. 3405, see also Krull, supra, at 350, 107 S.Ct. 1160. Second, respondent offers no evidence that court employees are inclined to ignore or subvert the Fourth Amendment or that lawlessness among these actors requires application of the extreme sanction of exclusion. See Leon, supra, at 916 and n. 14, 104 S.Ct. 3405; see also Krull, supra, at 350-351, 107 S.Ct. 1160. To the contrary, the Chief Clerk of the Justice Court testified at the suppression hearing that this type of error occurred once every three or four years. App. 37.
Finally, and most important, there is no basis for believing that application of the exclusionary rule in these circumstances will have a significant effect on court employees responsible for informing the police that a warrant has been quashed. Because court clerks are not adjuncts to the law enforcement team engaged in the often competitive enterprise of ferreting out crime, see Johnson v. United States, 333 U.S. 10, 14, 68 S.Ct. 367, 92 L.Ed. 436 (1948), they have no stake in the outcome of particular criminal prosecutions. Cf. Leon, at 917, 104 S.Ct. 3405; Krull, supra, at 352, 107 S.Ct. 1160. ...
If it were indeed a court clerk who was responsible for the erroneous entry on the police computer, application of the exclusionary rule also could not be expected to alter the behavior of the arresting officer. As the trial court in this case stated: "I think the police officer [was] bound to arrest. I think he would [have been] derelict in his duty if he failed to arrest." App. 51. Cf. Leon, supra, at 920, 104 S.Ct. 3405 ("`Excluding the evidence can in no way affect [the officer's] future conduct unless it is to make him less willing to do his duty.'" quoting Stone, 428 U.S., at 540, 96 S.Ct. 3037 (White, J., dissenting)). The Chief Clerk of the Justice Court testified that this type of error occurred "on[c]e every three or four years." App. 37. In fact, once the court clerks discovered the error, they immediately corrected it, id., at 30, 115 S.Ct. 1185, and then proceeded to search their files to make sure that no similar mistakes had occurred, id., at 37, 115 S.Ct. 1185. There is no indication that the arresting *289 officer was not acting objectively reasonably when he relied upon the police computer record. Application of the Leon framework supports a categorical exception to the exclusionary rule for clerical errors of court employees. See Leon, supra, at 916-922, 104 S.Ct. 3405; Sheppard, supra, at 990-991, 104 S.Ct. 3424.
Arizona v. Evans, 514 U.S. at 14-15, 115 S.Ct. 1185 (emphasis added) (citations omitted; footnote omitted). A faithful reading of Evans is that the exclusionary rule is to have a limited reach, not an expanding reach.
Third, it is patently erroneous to stretch the reach of the exclusionary rule or of White's application of the exclusionary rule to the Division of Driver Licenses. The Division of Driver Licenses is quite unmistakably an administrative agency. See Fla. Admin. Code R. 15-1.001-.006 (1998). This is obviously similar to the court clerk being in an administrative role in Evans. Although the majority of this Court may disagree with Evans or Leon, this Court's members are oath bound to recognize that this is the law.
HARDING, C.J., and QUINCE, J., concur.
NOTES
[1] The record reflects that Shadier was notified on April 24, 1997 that his license would be suspended if he did not complete an alcohol treatment course by May 14, 1997. Shadler completed the course and his license was returned to him on May 13, 1997.
[2] These divisions are: (1) Division of the Florida Highway Patrol, (2) Division of Driver Licenses, (3) Division of Motor Vehicles and (4) Division of Administrative Services. See Fla. Admin. Code. R. 15-1.002 (1998).
[3] For nearly sixty years, the Division of Driver Licenses and the Florida Highway Patrol have been serving interrelated functions as sister divisions in a larger department. The Department of Public Safety (DPS), composed of the Division of Driver Licenses and the Division of the Florida Highway Patrol was created in 1939. See ch. 19551, Laws of Fla. (1939). In 1969, the DPS was dissolved, and the Division of Driver Licenses and Florida Highway Patrol were transferred into the newly created DHSMV, as was the Department of Motor Vehicles. See ch. 69-106, § 24, Laws of Fla.
[4] Indeed, this interrelationship is codified in the Florida Administrative Code. Section 15-1.003(5)(d) of the Code provides: "The Chief of the Bureau of Field Operations [of the Florida Highway Patrol] ... shall perform the following duties ... (d) Conduct close liaison with the Director of the Drivers License Division, Motor Vehicle Division, and Florida Department of Law Enforcement."
[5] Cf. Albo v. State, 477 So.2d 1071, 1076 (Fla. 3d DCA 1985) (cautioning that the exclusionary rule is necessary to prevent "careless, perhaps deliberately neglectful, failure to delete names from [the list of people subject to apprehension] on ... the correct theory that the longer the list, the more persons subject to search and the consequent seizure of admissible evidence").