Justice Ginsburg,
with whom Justice Stevens, Justice Souter, and Justice Breyer join, dissenting.
Petitioner Bennie Dean Herring was arrested, and subjected to a search incident to his arrest, although no warrant was outstanding against him, and the police lacked probable cause to believe he was engaged in criminal activity. The arrest and ensuing search therefore violated Herring’s Fourth Amendment right “to be secure ... against unreasonable searches and seizures.” The Court of Appeals so determined, and the Government does not contend otherwise. The exclusionary rule provides redress for Fourth Amendment violations by placing the government in the position it would have been in had there been no unconstitutional arrest and search. The rule thus strongly encourages police compliance with the Fourth Amendment in the future. The Court, however, holds the rule inapplicable because careless recordkeeping by the police — not flagrant or deliberate misconduct — accounts for Herring’s arrest.
I would not so constrict the domain of the exclusionary rule and would hold the rule dispositive of this case: “[I]f courts are to have any power to discourage [police] error of [the kind here at issue], it must be through the application of the exclusionary rule.” Arizona v. Evans, 514 U. S. 1, 22-23 (1995) (Stevens, J., dissenting). The unlawful search in this case was contested in court because the police found methamphetamine in Herring’s pocket and a pistol in his truck. But the “most serious impact” of the Court’s holding will be on innocent persons “wrongfully arrested based on *149 erroneous information [carelessly maintained] in a computer data base.” Id., at 22.
I
A warrant for Herring’s arrest was recalled in, February 2004, apparently because it had been issued in error. See Brief for Petitioner 3, n. 1 (citing App. 63). The warrant database for the Dale County Sheriff’s Department, however, does not automatically update to reflect such changes. App. 39-40, 43, 45. A member of the Dale County Sheriff’s Department — whom the parties have not identified — returned the hard copy of the warrant to the County Circuit Clerk’s office, but did not correct the Department’s database to show that the warrant had been recalled. Id., at 60. The erroneous entry for the warrant remained in the database, undetected, for five months.
On a July afternoon in 2004, Herring came to the Coffee County Sheriff’s Department to retrieve his belongings from a vehicle impounded in that Department’s lot. Id., at 17. Investigator Mark Anderson, who was at the Department that day, knew Herring from prior interactions: Herring had told the District Attorney, among others, of his suspicion that Anderson had been involved in the killing of a local teenager, and Anderson had pursued Herring to get him to drop the accusations. Id., at 63-64. Informed that Herring was in the impoundment lot, Anderson asked the Coffee County warrant clerk whether there was an outstanding warrant for Herring’s arrest. Id., at 18. The clerk, Sandy Pope, found no warrant. Id., at 19.
Anderson then asked Pope to call the neighboring Dale County Sheriff’s Department to inquire whether a warrant to arrest Herring was outstanding there. Upon receiving Pope’s phone call, Sharon Morgan, the warrant clerk for the Dale County Department, checked her computer database. As just recounted, that Department’s database preserved an error. Morgan’s check therefore showed — incorrectly—an active warrant for Herring’s arrest. Id., at 41. Morgan *150 gave the misinformation to Pope, ibid., who relayed it to Investigator Anderson, id., at 35. Armed with the report that a warrant existed, Anderson promptly arrested Herring and performed an incident search minutes before detection of the error.
The Court of Appeals concluded, and the Government does not contest, that the “failure to bring the [Dale County Sheriff’s Department] records up to date [was] ‘at the very least negligent.’” 492 F. 3d 1212, 1217 (CA11 2007) (quoting Michigan v. Tucker, 417 U. S. 433, 447 (1974)). And it is uncontested here that Herring’s arrest violated his Fourth Amendment rights. The sole question presented, therefore, is whether evidence the police obtained through the unlawful search should have been suppressed.[1] The Court holds that suppression was unwarranted because the exclusionary rule’s “core concerns” are not raised by an isolated, negligent recordkeeping error attenuated from the arrest. Ante, at 144, 147-148.[2] In my view, the Court’s opinion underestimates the need for a forceful exclusionary rule and the gravity of recordkeeping errors in law enforcement.
II
A
The Court states that the exclusionary rule is not a defendant’s right, ante, at 141; rather, it is simply a remedy applicable only when suppression would result in appreciable deterrence that outweighs the cost to the justice system, ante, at 147-148. See also ante, at 144 (“[T]he exclusionary rule *151 serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence.”).
The Court’s discussion invokes a view of the exclusionary rule famously held by renowned jurists Henry J. Friendly and Benjamin Nathan Cardozo. Over 80 years ago, Cardozo, then seated on the New York Court of Appeals, commented critically on the federal exclusionary rule, which had not yet been applied to the States. He suggested that in at least some cases the rule exacted too high a price from the criminal justice system. See People v. Defore, 242 N. Y. 13, 24-25, 150 N. E. 585, 588-589 (1926). In words often quoted, Cardozo questioned whether the criminal should “go free because the constable has blundered.” Id., at 21, 150 N. E., at 587.
Judge Friendly later elaborated on Cardozo’s query. “The sole reason for exclusion,” Friendly wrote, “is that experience has demonstrated this to be the only effective method for deterring the police from violating the Constitution.” The Bill of Rights as a Code of Criminal Procedure, 53 Calif. L. Rev. 929, 951 (1965). He thought it excessive, in light of the rule’s aim to deter police conduct, to require exclusion when the constable had merely “blundered” — when a police officer committed a technical error in an on-the-spot judgment, id., at 952, or made a “slight and unintentional miscalculation,” id., at 953. As the Court recounts, Judge Friendly suggested that deterrence of police improprieties could be “sufficiently accomplished” by confining the rule to “evidence obtained by flagrant or deliberate violation of rights.” Ibid.; ante, at 143.
B
Others have described “a more majestic conception” of the Fourth Amendment and its adjunct, the exclusionary rule. Evans, 514 U. S., at 18 (Stevens, J., dissenting). Protective of the fundamental “right of the people to be secure in their persons, houses, papers, and effects,” the Amendment “is a *152 constraint on the power of the sovereign, not merely on some of its agents.” Ibid, (internal quotation marks omitted); see Stewart, The Road to Mapp v. Ohio and Beyond: The Origins, Development and Future of the Exclusionary Rule in Search-and-Seizure Cases, 83 Colum. L. Rev. 1365 (1983). I share that vision of the Amendment.
The exclusionary rule is “a remedy necessary to ensure that” the Fourth Amendment’s prohibitions “are observed in fact.” Id., at 1389; see Kamisar, Does (Did) (Should) the Exclusionary Rule Rest on a “Principled Basis” Rather Than an “Empirical Proposition”? 16 Creighton L. Rev. 565, 600 (1983). The rule’s service as an essential auxiliary to the Amendment earlier inclined the Court to hold the two inseparable. See Whiteley v. Warden, Wyo. State Penitentiary, 401 U.S. 560, 568-569 (1971). Cf. Olmstead v. United States, 277 U. S. 438, 469-471 (1928) (Holmes, J., dissenting); id., at 477-479, 483-485 (Brandeis, J., dissenting).
Beyond doubt, a main objective of the rule “is to deter— to compel respect for the constitutional guaranty in the only effectively available way — by removing the incentive to disregard it.” Elkins v. United States, 364 U. S. 206, 217 (1960). But the rule also serves other important purposes: It “enabl[es] the judiciary to avoid the taint of partnership in official lawlessness,” and it “assur[es] the people — all potential victims of unlawful government conduct — that the government would not profit from its lawless behavior, thus minimizing the risk of seriously undermining popular trust in government.” United States v. Calandra, 414 U. S. 338, 357 (1974) (Brennan, J., dissenting). See also Terry v. Ohio, 392 U. S. 1, 13 (1968) (“A ruling admitting evidence in a criminal trial, we recognize, has the necessary effect of legitimizing the conduct which produced the evidence, while an application of the exclusionary rule withholds the constitutional imprimatur.”); Kamisar, supra, at 604 (a principal reason for the exclusionary rule is that “the Court’s aid should be denied fin order to maintain respect for law [and] to preserve *153 the judicial process from contamination’ ” (quoting Olmstead, 277 U. S., at 484 (Brandeis, J., dissenting))).
The exclusionary rule, it bears emphasis, is often the only remedy effective to redress a Fourth Amendment violation. See Mapp v. Ohio, 867 U. S. 643, 652 (1961) (noting “the obvious futility of relegating the Fourth Amendment to the protection of other remedies”); Amsterdam, Perspectives on the Fourth Amendment, 58 Minn. L. Rev. 349, 360 (1974) (describing the exclusionary rule as “the primary instrument for enforcing the [FJourth [AJmendment”). Civil liability will not lie for “the vast majority of [FJourth [AJmendment violations — the frequent infringements motivated by commendable zeal, not condemnable malice.” Stewart, 83 Colum. L. Rev., at 1389. Criminal prosecutions or administrative sanctions against the offending officers and injunctive relief against widespread violations are an even farther cry. See id., at 1386-1388.
Ill
The Court maintains that Herring’s case is one in which the exclusionary rule could have scant deterrent effect and therefore would not “pay its way.” Ante, at 147-148 (internal quotation marks omitted). I disagree.
A
The exclusionary rule, the Court suggests, is capable of only marginal deterrence when the misconduct at issue is merely careless, not intentional or reckless. See ante, at 144, 146. The suggestion runs counter to a foundational premise of tort law — that liability for negligence, i. e., lack of due care, creates an incentive to act with greater care. The Government so acknowledges. See Brief for United States 21; cf. Reply Brief 12.
That the mistake here involved the failure to make a computer entry hardly means that application of the exclusionary rule would have minimal value. “Just as the risk of respondeat superior liability encourages employers to *154 supervise . . . their employees’ conduct [more carefully], so the risk of exclusion of evidence encourages policymakers and systems managers to monitor the performance of the systems they install and the personnel employed to operate those systems.” Evans, 514 U. S., at 29, n. 5 (Ginsburg, J., dissenting).
Consider the potential impact of a decision applying the exclusionary rule in this case. As earlier observed, see supra, at 149, the record indicates that there is no electronic connection between the warrant database of the Dale County Sheriff’s Department and that of the County Circuit Clerk’s office, which is located in the basement of the same building. App. 39-40, 43, 45. When a warrant is recalled, one of the “many different people that have access to th[e] warrants,” id., at 60, must find the hard copy of the warrant in the “two or three different places” where the Department houses warrants, id., at 41, return it to the Clerk’s office, and manually update the Department’s database, see id., at 60. The record reflects no routine practice of checking the database for accuracy, and the failure to remove the entry for Herring’s warrant was not discovered until Investigator Anderson sought to pursue Herring five months later. Is it not altogether obvious that the Department could take further precautions to ensure the integrity of its database? The Sheriff’s Department “is in a position to remedy the situation and might well do so if the exclusionary rule is there to remove the incentive to do otherwise.” 1 W. LaFave, Search and Seizure § 1.8(e), p. 313 (4th ed. 2004). See also Evans, 514 U. S., at 21 (Stevens, J., dissenting).
B
Is the potential deterrence here worth the costs it imposes? See ante, at 144. In light of the paramount importance of accurate recordkeeping in law enforcement, I would answer yes, and next explain why, as I see it, Herring’s motion presents a particularly strong case for suppression.
*155 Electronic databases form the nervous system of contemporary criminal justice operations. In recent years, their breadth and influence have dramatically expanded. Police today can access databases that include not only the updated National Crime Information Center (NCIC), but also terrorist watchlists, the Federal Government’s employee eligibility system, and various commercial databases. Brief for Electronic Privacy Information Center (EPIC) et al. as Amici Curiae 6. Moreover, States are actively expanding information sharing between jurisdictions. Id., at 8-13. As a result, law enforcement has an increasing supply of information within its easy electronic reach. See Brief for Petitioner 36-37.
The risk of error stemming from these databases is not slim. Herring’s amici warn that law enforcement databases are insufficiently monitored and often out of date. Brief for Amici EPIC 13-28. Government reports describe, for example, flaws in NCIC databases,[3] terrorist watchlist databases,[4] and databases associated with the Federal Government’s employment eligibility verification system.[5]
Inaccuracies in expansive, interconnected collections of electronic information raise grave concerns for individual liberty. “The offense to the dignity of the citizen who is arrested, handcuffed, and searched on a public street simply *156 because some bureaucrat has failed to maintain an accurate computer data base” is evocative of the use of general warrants that so outraged the authors of our Bill of Rights. Evans, 514 U. S., at 23 (Stevens, J., dissenting).
C
The Court assures that “exclusion would certainly be justified” if “the police have been shown to be reckless in maintaining a warrant system, or to have knowingly made false entries to lay the groundwork for future false arrests.” Ante, at 146. This concession provides little comfort.
First, by restricting suppression to bookkeeping errors that are deliberate or reckless, the majority leaves Herring, and others like him, with no remedy for violations of their constitutional rights. See supra, at 153. There can be no serious assertion that relief is available under 42 U. S. C. § 1983. The arresting officer would be sheltered by qualified immunity, see Harlow v. Fitzgerald, 457 U. S. 800 (1982), and the police department itself is not liable for the negligent acts of its employees, see Monell v. New York City Dept. of Social Servs., 436 U. S. 658 (1978). Moreover, identifying the department employee who committed the error may be impossible.
Second, I doubt that police forces already possess sufficient incentives to maintain up-to-date records. The Government argues that police have no desire to send officers out on arrests unnecessarily, because arrests consume resources and place officers in danger. The facts of this case do not fit that description of police motivation. Here the officer wanted to arrest Herring and consulted the Department’s records to legitimate his predisposition. See App. 17-19.[6]
*157 Third, even when deliberate or reckless conduct is afoot, the Court’s assurance will often be an empty promise: How is an impecunious defendant to make the required showing? If the answer is that a defendant is entitled to discóvery (and if necessary, an audit of police databases), see Tr. of Oral Arg. 57-58, then the Court has imposed a considerable administrative burden on courts and law enforcement.[7]
IV
Negligent recordkeeping errors by law enforcement threaten individual liberty, are susceptible to deterrence by the exclusionary rule, and cannot be remedied effectively through other means. Such errors present no occasion to further erode the exclusionary rule. The rule “is needed to make the Fourth Amendment something real; a guarantee that does not carry with it the exclusion of evidence obtained by its violation is a chimera.” Calandra, 414 U. S., at 361 (Brennan, J., dissenting). In keeping with the rule’s “core concerns,” ante, at 144, suppression should have attended the unconstitutional search in this case.
* * *
For the reasons stated, I would reverse the judgment of the Eleventh Circuit.

 That the recordkeeping error occurred in Dale County rather than Coffee County is inconsequential in the suppression analysis. As the Court notes, “we must consider the actions of all the police officers involved.” Ante, at 140. See also United States v. Leon, 468 U. S. 897, 923, n. 24 (1984).

 It is not altogether clear how “isolated” the error was in this case. When the Dale County Sheriff’s Department warrant clerk was first asked: “[H]ow many times have you had or has Dale County had problems, any problems with communicating about warrants,” she responded: “Several times.” App. to Pet. for Cert. 17a (internal quotation marks omitted).

 See Dept. of Justice, Bureau of Justice Statistics, P. Brien, Improving Access to and Integrity of Criminal History Records (NCJ 200581, July 2005), available at http://www.ojp.usdoj.gov/bjs/pub/pdf/iaichr.pdf. (All Internet materials as visited Jan. 12,2009, and included in Clerk of Court’s case file.)

 See Dept. of Justice, Office of Inspector General, Audit of the U. S. Department of Justice Terrorist Watchlist Nomination Processes (Audit Rep. 08-16, Mar. 2008), http://www.usdoj.gov/oig/reports/plus/a0816/ final.pdf.

 See Social Security Admin., Office of Inspector General, Congressional Response Report: Accuracy of the Social Security Administration’s Numident File (A-08-06-26100, Dee. 2006), http://www.ssa.gov/oig/ ADOBEPDF/A-08-06-26100.pdf.

 It has been asserted that police departments have become sufficiently “professional” that they do not need external deterrence to avoid Fourth Amendment violations. See Tr. of Oral Arg. 24-25; cf. Hudson v. Michigan, 547 U. S. 586, 598-599 (2006). But professionalism is a sign of the exclusionary rule’s efficacy — not of its superfluity.

 It is not clear how the Court squares its focus on deliberate conduct with its recognition that application of the exclusionary rule does not require inquiry into the mental state of the police. See ante, at 145; Whren v. United States, 517 U. S. 806, 812-813 (1996).