Chief Judge GRATTON,
Dissenting.
I respectfully dissent. While the district court and the majority recite the applicable seizure standard in varying ways, I wish to first review that standard, and initially state that it is not simply that “[t]he district court’s task is to determine, based on the totality of the circumstances, whether a reasonable person would feel free to decline to cooperate with police.” In State v. Willoughby, 147 Idaho 482, 211 P.3d 91 (2009), the Idaho Supreme Court stated that the test to determine whether a seizure has occurred for Fourth Amendment purposes is “whether the officers’ show of authority was such that a reasonable person would not feel free to leave.” Id. at 486, 211 P.3d at 95. The standard, therefore, has two components, not one. The first component is the nature of the officer’s actions and the second component is the reasonable person’s response to those actions. The analysis considers the totality of the circumstances. Florida v. Bostick, 501 U.S. 429, 439, 111 S.Ct. 2382, 2388-89, 115 L.Ed.2d 389, 401-02 (1991).
Turning first to the officer’s actions, the Court in Willoughby held that “[a] seizure initiated through a show of authority requires words or actions, or both, by a law enforcement officer that would convey to a reasonable person that the officer was ordering him or her to restrict his or her movement.” Willoughby, 147 Idaho at 486, 211 P.3d at 95. Indeed, “[a] seizure under the meaning of the Fourth Amendment occurs only “when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen.’ ” State v. Nickel, 134 Idaho 610, 612, 7 P.3d 219, 221 (2000) (quoting Terry v. Ohio, 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 1879 n. 16, 20 L.Ed.2d 889, 905 n. 16 (1968)). A seizure occurs “only when there is a governmental termination of freedom of movement through means intentionally applied.” Brower v. County of Inyo, 489 U.S. 593, 596-97, 109 S.Ct. 1378, 1381, 103 L.Ed.2d 628, 635-36 (1989); see Brendlin v. California, 551 U.S. 249, 254, 127 S.Ct. 2400, 2405, 168 L.Ed.2d 132, 137-38 (2007); Scott v. Harris, 550 U.S. 372, 381, 127 S.Ct. 1769, 1776-77, 167 L.Ed.2d 686, 694-95 (2007). The officer must convey a message that compliance is required; otherwise the encounter is deemed consensual. State v. Fry, 122 Idaho 100, 102, 831 P.2d 942, 944 (Ct.App.1991). In State v. Nelson, 134 Idaho 675, 8 P.3d 670 (Ct.App.2000), we held that “unless the circumstances of the encounter are ‘so intimidating as to demonstrate that a reasonable person would have believed he [or she] was not free to leave if he [or she] had not responded,’ one cannot say that an officer’s request results in a seizure within the meaning of the Fourth Amendment.” Id. at 678, 8 P.3d at 673 (quoting Immigration and Naturalization Service v. Delgado, 466 U.S. 210, 216, 104 S.Ct. 1758, 1763, 80 L.Ed.2d 247, 255 (1984)). Thus, in my view, the officer’s action must be an intentional demonstration of force or authority meant to convey restriction of movement, not simply intentional in the sense of a volitional action. Moreover, the nature of the officer’s action must be intimidating,[2] at least in the sense of conveying a message that compliance is required.
Examples of circumstances that might indicate seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer’s request might be compelled.
Turning next to the response of the reasonable person, in Willoughby the Court reiterated that the nature of the officer’s conduct must be such “that would convey to a reasonable person that the officer was ordering him or her to restrict his or her movement.” Willoughby, 147 Idaho at 486, 211 P.3d at 95 (emphasis added). In Nelson, we noted that the inquiry is not whether a majority of citizens would comply with an officer’s request for information, quoting Chief Justice Rehnquist’s statement that while “most citizens will respond to a police request, the fact *172 that people do so, and do so without being told they are free not to respond, hardly eliminates the consensual nature of the response.” Nelson, 134 Idaho at 679, 8 P.3d at 674 (quoting Delgado, 466 U.S. at 216, 104 S.Ct. at 1762, 80 L.Ed.2d at 255). The Nelson Court again stated that it must be determined whether the officer’s action “was so intimidating as to cause a reasonable person — not a majority of lay persons — to believe that the person was not free to leave if the person chose to ignore the request.” Id. The Nelson Court also noted that the reasonable person test presupposes an innocent person. Id. See also Bostick, 501 U.S. at 438, 111 S.Ct. at 2388, 115 L.Ed.2d at 400-01.
In this ease, the officer noticed a vehicle unusually parked away from the street, facing the backs of homes across a canal, on a strip of bare land near Capital High School in Boise. As the officer approached the vehicle, he noticed that the back window was covered with what appeared to be a sleeping bag. As the officer approached the passenger side of the vehicle, he noticed Lieehty inside, although the passenger window was partially covered by a shade. Lieehty testified that the officer tapped on the window and Lieehty stated that “the window works” and reached to take the blind down and open the window. Based upon these facts, the officer attempted to initiate the encounter through the window. The officer testified that, as he could first see Lieehty, he saw something in his hands. The officer stated that he asked Lieehty if the door worked or would open. Lieehty stated that the window worked and began to remove the screen to open the window. Based upon these facts, Lieehty was content to, at least, engage the officer on a consensual basis. In order to make sure that the item in Liechty’s hand was not a weapon, and for officer safety concerns, the officer opened the door instead of waiting for Lieehty to remove the screen and open the window. The officer did not enter the vehicle, physically restrain Lieehty, draw his weapon, or in any way verbally communicate to Lieehty that he was not free to leave. At that time, there were no other officers on the scene and the patrol car lights were not activated. The officer then talked to Lieehty through the open door.
Now, as I read the decision of the district court and the majority opinion, neither hold that a seizure occurred solely because the officer opened the door instead of engaging Lieehty through the window. The district court held that:
[A] seizure of the defendant occurred when the officer opened the car door and stood in the area of the opened door. No reasonable person would feel free not to talk to a police officer who was standing by their open passenger door.... In order to terminate the conversation, the defendant would have had to drive away in reverse, a reasonable person would not try to back out of the place they were parked if someone was standing by an opened passenger door because they could hurt the person standing by the door.
(Emphasis added.) Finally, the district court stated that “[n]o reasonable person would drive off and terminate the encounter when the only way to leave would be to back out and would result in the officer being potentially injured.” Similarly, the majority states that “[w]e also recognize, as did the district court, that the officer’s position inside the doorway, alone, did not constitute a seizure.” The majority concludes, however, that because the officer’s position inside the doorway blocked “the vehicle’s exit route,” a seizure occurred.
The district court found that Lieehty’s car “was next to a dirt mound and some bushes and would have had to have been put into reverse to pull out.” This finding is crucial because the district court states that the officer’s standing in the doorway, then, “effectively” blocked Liechty’s ability to disengage from the conversation.[3] Interestingly, Lieehty never made this claim either factually or as a basis for finding a seizure. Moreover, Lieehty never testified at all about a physical or practical inability, because of the *173 officer’s position and the terrain, to disengage the encounter. He did, however, testify that he was out of gas, a fact I will come back to. He also testified that he was driving a two-door Suzuki Sidekick, an SUV-type vehicle, like the small version of a Jeep— maneuverable. Photographs in the record show the small vehicle. Lieehty testified that there was about fifteen feet from the front of his vehicle to the canal. The photographs in the record show that there were at least several feet to the canal. The majority concludes that “it was reasonable for the district court to infer that Lieehty could not have pulled forward to terminate his conversation with the officer and could not have backed out of the dirt lot without causing possible injury to the officer standing in the open passenger doorway.” The difficulty I have with the conclusion is that it presumes that to disengage from an officer, an individual must completely flee the scene. There is no question from the evidence that, even if Lieehty could not have turned back to the road with just a forward turn, he could have moved the vehicle forward several feet, no less than the length of the vehicle, thus disengaging from the open door conversation. If, then, the officer did something to stop him or prevent further movement, a seizure would occur.
I agree that an officer can effect a seizure by physically blocking a person’s ability to leave. But, the situation in this case is decidedly different from Fry, 122 Idaho at 102, 831 P.2d at 944, where, while one officer approached the passenger side window of a ear in a parking stall, another officer placed himself at the back of the vehicle, blocking any exit. The second officer in Fry intentionally acted in such a way as to, not only practically prevent Fry from leaving, but to clearly communicate to Fry that he was ordering him not to leave. While the district court here stated that the officer’s action “effectively” blocked Lieehty, the majority, in an effort to demonstrate that this case is “similar to Fry,” finds that “the officer here deliberately placed himself in a position that prevented Lieehty from leaving” (emphasis added). This is apparently an effort by the majority to not only state that the officer was volitionally standing in the doorway, but that his conduct was the type of intentional, intimidating, communicative act demonstrated in Fry and, as I have noted, required by the applicable standards in order to effectuate a seizure. With that finding or implication I cannot disagree more. There is absolutely no support in the record to conclude that the officer’s standing in the doorway was “deliberate” in that context.
The majority relies upon certain language from Nickel, 134 Idaho at 613, 7 P.3d at 222, which states that:
Although as a practical matter the dead-end road and muddy conditions might have discouraged Nickel from departing, this is not dispositive for Fourth Amendment purposes. The Fourth Amendment is not implicated where factors independent of police conduct prevent an individual from departing.
From this language, the majority appears to conclude that these other factors are irrelevant. I disagree. Factors other than officer conduct are not necessarily dispositive in the sense that an officer could still effect a seizure for Fourth Amendment purposes. For example, an officer could pull up behind an inoperable car on the side of the road with its hood up. Clearly, other conditions exist that prevent the individuals inside from departing. However, if the officer, upon engaging the occupants, orders that they remain in their seats, a seizure has occurred. The Nickel Court’s statement that “[t]he Fourth Amendment is not implicated where factors independent of police conduct prevent an individual from departing” does not mean that those factors are irrelevant, but only that no seizure has occurred in that circumstance, absent police conduct communicating detention. In fact, in State v. Martinez, 136 Idaho 436, 441, 34 P.3d 1119, 1124 (Ct.App.2001), the Court held that “a court must ‘look to whether the restrictions on the subject’s freedom of movement were imposed by a factor independent of police conduct.’ ” (quoting State v. Pick, 124 Idaho 601, 604, 861 P.2d 1266, 1269 (Ct.App.1993) (emphasis added)). “If the restriction comes from a source independent of police conduct, then the subject is not seized for purposes of the Fourth *174 Amendment.” Id. at 441, 34 P.3d at 1124. In Martinez, the Court stated:
Here, the restriction on Martinez’s movement was the inoperability of the ear, a factor entirely independent from police conduct. Martinez could not drive away, and may have been hesitant to walk away leaving his disabled car with all the luggage, but he was not prevented from doing so by the police.

Id.

In this ease, Liechty’s car was inoperable. He testified that he was out of gas and immediately told the officer that fact. Liechty could not drive away, and most assuredly was hesitant to walk away. Liechty was dressed in a skirt, blouse, bra containing water-filled condoms, and knee-high boots. He testified to his extreme embarrassment that children gathering at Capital High School might be able to see him when the door was opened. He was not walking away. Additionally, he testified that he had a bicycle on the back of his vehicle that he had intended to ride away but for his attire. Finally, Liechty was likely extremely hesitant to walk away leaving his disabled vehicle with personally and legally incriminating items including: pornographic magazines, petroleum jelly, condoms and/or condom wrappers, dildo-type items, binoculars, women’s panties, children’s panties, a fake vagina, a concealed weapon (knife), and methamphetamine. These facts, when compared to the officer’s ambiguous, at best, imposition of a theoretical practical impediment to leaving the scene, lead me to the inescapable conclusion that the restrictions on Lieehty’s freedom of movement were imposed by factors independent of the officer’s conduct.[4] In the end, based upon the totality of the circumstances, an innocent and reasonable person— say a bird watcher with binoculars and bird books — would not believe that he or she was not free to break off the encounter with the officer.
Finally, the State argues that suppression, by application of the exclusionary rule, is unwarranted in this case, specifically pointing to the attenuation and inevitable discovery doctrines. The majority rejects the application of these doctrines in this case. Recently, importantly, the United States Supreme Court reviewed its jurisprudence regarding the exclusionary rule in Davis v. United States, — U.S.-,-, 131 S.Ct. 2419, 2426-27, 180 L.Ed.2d 285, 293-95 (2011):
The Fourth Amendment protects the “right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.” The Amendment says nothing about suppressing evidence obtained in violation of this command. That rule — the exclusionary rule — is a “prudential” doctrine, Pennsylvania Bd. of Probation and Parole v. Scott, 524 U.S. 357, 363, 118 S.Ct. 2014 [2019], 141 L.Ed.2d 344 [351-52] (1998), created by this Court to “compel respect for the constitutional guaranty.” Elkins v. United States, 364 U.S. 206, 217, 80 S.Ct. 1437 [1444], 4 L.Ed.2d 1669 [1677] (1960); see Weeks v. United States, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914); Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). Exclusion is “not a personal constitutional right,” nor is it designed to “redress the injury” occasioned by an unconstitutional search. Stone v. Powell, 428 U.S. 465, 486, 96 S.Ct. 3037 [3048], 49 L.Ed.2d 1067 [1083] (1976); see United States v. Janis, 428 U.S. 433, 454 n. 29, 96 S.Ct. 3021 [3032 n. 29], 49 L.Ed.2d 1046 [1061 n. 29] (1976) (exclusionary rule “unsupportable as reparation or compensatory dispensation to the injured criminal” *175 (internal quotation marks omitted)). The rule’s sole purpose, we have repeatedly held, is to deter future Fourth Amendment violations. E.g., Herring [v. United States, 555 U.S. 135,] 141 n. 2, 129 S.Ct. 695 [700 n. 2, 172 L.Ed.2d 496, 504-05 n. 2 (2009) ]; United States v. Leon, 468 U.S. 897, 909, 921, n. 22, 104 S.Ct. 3405 [3413, 3419, n. 22], 82 L.Ed.2d 677 [697, -, n. 22] (1984); Elkins, supra, at 217, 80 S.Ct. 1437 [1444, 4 L.Ed.2d at 1677] (“calculated to prevent, not to repair”). Our cases have thus limited the rule’s operation to situations in which this purpose is “thought most efficaciously served.” United States v. Calandra, 414 U.S. 338, 348, 94 S.Ct. 613 [620], 38 L.Ed.2d 561 [571] (1974). Where suppression fails to yield “appreciable deterrence,” exclusion is “clearly ... unwarranted.” Janis, supra, at 454, 96 S.Ct. 3021 [3032, 49 L.Ed.2d at 1060-61].
Real deterrent value is a “necessary condition for exclusion,” but it is not “a sufficient” one. Hudson v. Michigan, 547 U.S. 586, 596, 126 S.Ct. 2159 [2166], 165 L.Ed.2d 56 [67] (2006). The analysis must also account for the “substantial social costs” generated by the rule. Leon, supra, at 907, 104 S.Ct. 3405 [3412, 82 L.Ed.2d at 688]. Exclusion exacts a heavy toll on both the judicial system and society at large. Stone, 428 U.S. at 490-491, 96 S.Ct. 3037 [3050-51, 49 L.Ed.2d at 1085-86]. It almost always requires courts to ignore reliable, trustworthy evidence bearing on guilt or innocence. Ibid. And its bottom-line effect, in many eases, is to suppress the truth and set the criminal loose in the community without punishment. See Herring, supra, at 141, 129 S.Ct. 695 [700-01, 172 L.Ed.2d at 504-05]. Our cases hold that society must swallow this bitter pill when necessary, but only as a “last resort.” Hudson, supra, at 591, 126 S.Ct. 2159 [2163, 165 L.Ed.2d at 64]. For exclusion to be appropriate, the deterrence benefits of suppression must outweigh its heavy costs. See Herring, supra, at 141, 129 S.Ct. 695 [700-01, 172 L.Ed.2d at 504-05]; Leon, supra, at 910, 104 S.Ct. 3405 [3413-14, 82 L.Ed.2d at 690],
Admittedly, there was a time when our exclusionary-rule cases were not nearly so discriminating in their approach to the doctrine. “Expansive dicta” in several decisions, see Hudson, supra, at 591, 126 S.Ct. 2159 [2163, 165 L.Ed.2d at 64], suggested that the rule was a self-executing mandate implicit in the Fourth Amendment itself. See Olmstead v. United States, 277 U.S. 438, 462, 48 S.Ct. 564 [567], 72 L.Ed. 944 [949] (1928) (remarking on the “striking outcome of the Weeks ease” that “the Fourth Amendment, although not referring to or limiting the use of evidence in courts, really forbade its introduction”); Mapp, supra at 655, 81 S.Ct. 1684 [1691, 6 L.Ed.2d at 1090] (“[A]ll evidence obtained by searches and seizures in violation of the Constitution is, by that same authority, inadmissible in a state court.”). As late as our 1971 decision in Whiteley v. Warden, Wyo. State Penitentiary, 401 U.S. 560, 568-569, 91 S.Ct. 1031 [1037], 28 L.Ed.2d 306 [313-14 (1971) ], the Court “treated identification of a Fourth Amendment violation as synonymous with application of the exclusionary rule.” Arizona v. Evans, 514 U.S. 1, 13, 115 S.Ct. 1185 [1192], 131 L.Ed.2d 34 [45-46] (1995). In time, however, we came to acknowledge the exclusionary rule for what it undoubtedly is — a “judicially created remedy” of this Court’s own making. Calandra, supra, at 348, 94 S.Ct. 613 [620, 38 L.Ed.2d at 571]. We abandoned the old, “reflexive” application of the doctrine, and imposed a more rigorous weighing of its costs and deterrence benefits. Evans, supra, at 13, 115 S.Ct. 1185 [1192, 131 L.Ed.2d at 45-46]; see, e.g., Calandra, supra; Janis, supra; Stone, supra; INS v. Lopez-Mendoza, 468 U.S. 1032, 104 S.Ct. 3479, 82 L.Ed.2d 778 (1984); United States v. Havens, 446 U.S. 620, 100 S.Ct. 1912, 64 L.Ed.2d 559 (1980). In a line of cases beginning with United States v. Leon, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677, we also recalibrated our cost-benefit analysis in exclusion cases to focus the inquiry on the “flagraney of the police misconduct” at issue. Id., at 909, 911, 104 S.Ct. 3405 [3413, 3414, 82 L.Ed.2d at 689, 691].
*176 The basic insight of the Leon line of cases is that the deterrence benefits of exclusion “var[y] with the culpability of the law enforcement conduct” at issue. Herring, 555 U.S., at 143, 129 S.Ct. 695 [701, 172 L.Ed.2d at 506]. When the police exhibit “deliberate,” “reckless,” or “grossly negligent” disregard for Fourth Amendment rights, the deterrent value of exclusion is strong and tends to outweigh the resulting costs. Id. at 144, 129 S.Ct. 695 [702, 172 L.Ed.2d at 506-07]. But when the police act with an objectively “reasonable good-faith belief’ that their conduct is lawful, Leon, supra, at 909, 104 S.Ct. 3405 [3413, 82 L.Ed.2d at 689] (internal quotation marks omitted), or when their conduct involves only simple, “isolated” negligence, Herring, supra, at 137, 129 S.Ct. 695 [698, 172 L.Ed.2d at 502], the “ ‘deterrence rationale loses much of its force,’ ” and exclusion cannot “pay its way.” See Leon, supra, at 919, 908 n. 6, 104 S.Ct. 3405 [3418, 3412 n. 6, 82 L.Ed.2d at 696, 688-89 n. 6] (quoting United States v. Peltier, 422 U.S. 531, 539, 95 S.Ct. 2313 [2318], 45 L.Ed.2d 374 [382] (1975)).
In addition, the Supreme Court stated:
Police practices trigger the harsh sanction of exclusion only when they are deliberate enough to yield “meaningfu[l]” deterrence, and culpable enough to be “worth the price paid by the justice system.” Herring, 555 U.S. at 144, 129 S.Ct. 695 [702, 172 L.Ed.2d at 507]. The conduct of the officers here was neither of these things. The officers who conducted the search did not violate Davis’s Fourth Amendment rights deliberately, recklessly, or with gross negligence. See ibid. Nor does this case involve any “recurring or systemic negligence” on the part of law enforcement. Ibid.
Davis, — U.S. at-, 131 S.Ct. at 2428, 180 L.Ed.2d at 295-96. In this case, the officer did not violate Liechty’s Fourth Amendment rights deliberately, recklessly, or with gross negligence. Nor does this case involve any recurring or systemic negligence. I would apply the exclusionary rule in Idaho consistent with the United States Supreme Court’s pronouncement. I further agree with the State’s position regarding the applicability of the exceptions.

. This intimidating nature of the officer’s action is otherwise described in United States v. Mendenhall, 446 U.S. 544, 554, 100 S.Ct. 1870 [1877], 64 L.Ed.2d 497 [509] (1980):

. The State contends that the evidence in the record is insufficient to even conclude that the officer was actually standing in the open doorway. However, it is reasonable to conclude from the evidence that the officer was, upon opening the door, standing in the open doorway talking to Lieehty.

. These facts also lead me to question whether Liechty actually submitted to a show of authority. In Willoughby, our Supreme Court held that for a seizure to occur "the motorist must actually submit to the show of authority.’’ Willoughby, 147 Idaho at 488, 211 P.3d at 97. The Court looked to a Kansas case which "addressed the difficult question presented in cases of passive acquiescence to an ambiguous show of authority,” something that might be said of the case at bar. Id. The Willoughby Court held that by the motorist remaining on the scene and stepping out of his vehicle as the officer approached was a submission to the officer’s authority. Id. at 489, 211 P.3d at 98. The Willoughby Court did not have before it, as here, the fact that the motorist’s vehicle was inoperable and the motorist was self-described as "indecent.” The fact that Liechty remained on the scene was much more because of the presence of these circumstances, than an ambiguous show of authority by the officer.