Justice SOTOMAYOR, dissenting.
I respectfully dissent because I do not believe these cases should ever have been reviewed by the Supreme Court. I see no reason to intervene in cases like these-and plenty of reasons not to. Kansas has not violated any federal constitutional right. If anything, the State has overprotected its citizens based on its interpretation of state and federal law. For reasons ably articulated by my predecessors and colleagues and because I worry that cases like these prevent States from serving as necessary laboratories for experimenting with how best to guarantee defendants a fair trial, I would dismiss the writs as improvidently granted.
I
In 2014, the Kansas Supreme Court vacated three death sentences-the sentences of Sidney Gleason and the Carr brothers, Reginald and Jonathan-because *647 of constitutional errors in the penalty phases of their trials.
All three men were tried under jury instructions that did not include language previously mandated by the Kansas Supreme Court. The instructions did not state that, under Kansas' statutory scheme, mitigating circumstances need only be proven to an individual juror's satisfaction and not beyond a reasonable doubt. 299 Kan. 1127, 1192-1197, 329 P.3d 1102, 1145-1148 (2014) (Sidney Gleason); 300 Kan. 1, 302-303, 331 P.3d 544, 732-733 (2014) (Reginald Carr); 300 Kan. 340, 368-369, 329 P.3d 1195, 1213 (2014) (Jonathan Carr). The court found that the instructions therefore both undermined Kansas' state law and created a "reasonable likelihood that the jury ... applied the challenged instruction in a way that prevents consideration" of mitigating evidence as required by the Federal Constitution. 299 Kan., at 1191-1197, 329 P.3d, at 1144-1148 (quoting Boyde v. California, 494 U.S. 370, 380, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990) ).
The Kansas Supreme Court also vacated the Carr brothers' death sentences because they were jointly tried at the penalty phase. The court concluded that each brother's particular case for mitigation compromised the other brother's case and therefore that trying them jointly violated the Eighth Amendment right to individualized sentencing. The error was not harmless, the Kansas Supreme Court found, because an "especially damning subset" of the evidence presented might not have been admitted in separate penalty proceedings. 300 Kan., at 275-282, 331 P.3d, at 717-720, 300 Kan., at 369-370, 329 P.3d, at 1212.
The Kansas attorney general requested certiorari, alleging that it would best serve the State's interest for a federal court to intervene and correct the Kansas Supreme Court. This Court complied, even though there was no suggestion that the Kansas Supreme Court had violated any federal constitutional right. The majority now reverses the Kansas Supreme Court on both points.
II
A
Even where a state court has wrongly decided an "important question of federal law," Sup.Ct. Rule 10, we often decline to grant certiorari, instead reserving such grants for instances where the benefits of hearing a case outweigh the costs of so doing. My colleagues and predecessors have effectively set forth many of the costs of granting certiorari in cases where state courts grant relief to criminal defendants: We risk issuing opinions that, while not strictly advisory, may have little effect if a lower court is able to reinstate its holding as a matter of state law. Florida v. Powell, 559 U.S. 50, 66, 130 S.Ct. 1195, 175 L.Ed.2d 1009 (2010) (Stevens, J., dissenting). We expend resources on cases where the only concern is that a State has " 'overprotected' " its citizens. Michigan v. Long, 463 U.S. 1032, 1068, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983) (Stevens, J., dissenting). We intervene in an intrastate dispute between the State's executive and its judiciary rather than entrusting the State's structure of government to sort it out. See Coleman v. Thompson, 501 U.S. 722, 766-767, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991) (Blackmun, J., dissenting). And we lose valuable data about the best methods of protecting constitutional rights-a particular concern in cases like these, where the federal constitutional question turns on the "reasonable likelihood" of jury confusion, an empirical question best answered with evidence from many state courts. Cf.
*648 Arizona v. Evans, 514 U.S. 1, 30-31, 115 S.Ct. 1185, 131 L.Ed.2d 34 (1995) (GINSBURG, J., dissenting).
B
The cases here demonstrate yet another cost of granting certiorari to correct a state court's overprotection of federal rights: In explaining that the Federal Constitution does not protect some particular right, it is natural to buttress the conclusion by explaining why that right is not very important. In so doing, the Court risks discouraging States from adopting valuable procedural protections even as a matter of their own state law.
State experimentation with how best to guarantee a fair trial to criminal defendants is an essential aspect of our federalism scheme. See, e.g., Linde, First Things First: Rediscovering the States' Bill of Rights, 9 U. Balt. L. Rev. 379, 393 (1980). The Federal Constitution guarantees only a minimum slate of protections; States can and do provide individual rights above that constitutional floor. See, e.g., Brennan, The Bill of Rights and the States: the Revival of State Constitutions as Guardians of Constitutional Rights, 61 N.Y. U. L. Rev. 535, 548-550 (1986). That role is particularly important in the criminal arena because state courts preside over many millions more criminal cases than their federal counterparts and so are more likely to identify protections important to a fair trial. Compare Court Statistics Project, Examining the Work of State Courts: An Analysis of 2010 State Court Caseloads 19-21 (2012), with Dept. of Justice, Bureau of Justice Statistics, Federal Justice Statistics 2011-2012, pp. 19-20 (Jan. 2015) (Tables 11 and 12).
The majority's opinion in these cases illustrates how an unnecessary grant of certiorari can lead to unexpected costs by disrupting this sort of state experimentation. Take the first question presented in these cases. The majority's actual holding is that the Eighth Amendment does not require an instruction specifying that mitigating factors need not be proven beyond a reasonable doubt. Ante, at 642 - 643. The Eighth Amendment has nothing to say about whether such an instruction is wise as a question of state law or policy. But the majority nonetheless uses this Court's considerable influence to call into question the logic of specifying any burden of proof as to mitigating circumstances. The majority claims that while assessing an aggravating factor is "a purely factual determination," assessing mitigation involves "a judgment call (or perhaps a value call)" and is thus not amenable to burdens of proof. Ante, at 642. Short of dividing the mitigating factor "into its factual component and its judgmental component," and issuing burden-of-proof instructions only as to the former, the majority wonders "whether it is even possible to apply a standard of proof to the mitigating-factor determination." Ibid.
By this observation, and with no experience with the needs of juries, the majority denigrates the many States that do specify a burden of proof for the existence of mitigating factors as a matter of state law, presumably under the belief that it is, in fact, "possible" to do so.* Brief for Respondent in No. 14-452, pp. 28-29, and n. 6. Some States even recommend an instruction specifying that mitigating factors need not be proven beyond a reasonable *649 doubt. See, e.g., Idaho Jury Instr., Crim., ICJI 1718, Jury Deliberations (2010); Okla. Jury Instr., Crim., OUJI-CR 4-78 (2015).
The majority's discussion of severance likewise short circuits state experimentation. The majority is not content to hold that the Eighth Amendment does not, strictly speaking, require severance of capital penalty proceedings. Instead, it goes on to explain why joint capital sentencing proceedings are not only permissible under the Federal Constitution but are, in fact, preferable as a policy matter: "Better that two defendants who have together committed the same crimes be placed side-by-side to have their fates determined by a single jury." Ante, at 646. The majority even intimates that severed proceedings may be worse for defendants: "To forbid joinder in capital-sentencing proceedings would, perversely, increase the odds of 'wanto[n] and freakis[h]' imposition of death sentences." Ibid. (quoting Gregg v. Georgia, 428 U.S. 153, 206-207, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) (joint opinion of Stewart, Powell, and Stevens, JJ.)).
So much for Ohio's, Georgia's, and Mississippi's sentencing regimes, all of which routinely allow severance at both phases of capital proceedings. See Ga.Code Ann. § 17-8-4 (2013) (upon request, defendants must be tried separately in capital cases); Miss.Code Ann. § 99-15-47 (2015) (same) ; Ohio Rev.Code Ann. § 2945.20 (Lexis 2014) (capital defendants shall be tried separately unless good cause is shown for a joint trial). There is no evidence that any of those three States adopted a severance regime based on a misunderstanding of the Eighth Amendment. But without any empirical foundation or any basis in experience, the majority asserts that such regimes may increase the odds of arbitrariness.
The majority claims that we " 'return power to the State, and to its people,' " when we explain that the Federal Constitution does not require a particular result. Ante, at 641 - 642 (emphasis deleted). But that is only so when the Court is able to pass solely on the federal constitutional ground and not the wisdom of a state holding on an equivalent question. Though the Court pretends that it sends back cases like this one with a clean slate, it rarely fully erases its thoughts on the virtues of the procedural protection at issue. By placing a thumb on the scale against a State adopting-even as a matter of state law-procedural protections the Constitution does not require, the Court risks turning the Federal Constitution into a ceiling, rather than a floor, for the protection of individual liberties.
III
I see no reason why these three cases out of the Kansas Supreme Court warranted our intervention given the costs that I have just described and those described by my predecessors and colleagues, see supra, at 647 - 648. No federal right has been compromised. And nobody disputes that the State of Kansas could, as a matter of state law, reach the same outcome.
Perhaps most importantly, both of the questions on which the Court granted certiorari turn on specific features of Kansas' sentencing scheme. As a result, the Kansas Supreme Court's opinion is unlikely to have much salience for other States. If the Kansas Supreme Court was wrong, its wrong opinion will not subvert federal law on a broader scale.
First, the Kansas court's decision on the jury instruction question aimed to "both preserv[e] the [state] statute's favorable distinction and protec[t] a capital defendant's Eighth Amendment right to individualized sentencing by ensuring jurors are *650 not precluded from considering all relevant mitigating evidence." 299 Kan., at 1196, 329 P.3d, at 1147 (emphasis added). The Kansas Supreme Court's decision was thus informed by a combination of federal and state considerations. A decision that expressly relies on a State's unique statutory scheme-as did the Kansas Supreme Court's here-has limited potential for influencing other States.
It is not absurd to conclude that a juror unfamiliar with the mechanics of the law might be confused by Kansas' jury instructions, which almost always mention aggravating and mitigating instructions in the same breath. Id., at 1196-1197, 329 P.3d, at 1147-1148. The Kansas Supreme Court's opinion rested largely on the specific language and ordering of that State's instructions. Other States' jury instructions may be less likely to have the same effect.
Moreover, the decision below was made against the unique backdrop of trial courts' failure to implement the Kansas Supreme Court's earlier demands for a change to jury instructions in capital cases. In a 2001 case, the Kansas Supreme Court considered the jury instructions insufficiently confusing to reverse the judgment, but sufficiently confusing to demand higher clarity going forward: "[A]ny instruction dealing with the consideration of mitigating circumstances should state (1) they need to be proved only to the satisfaction of the individual juror in the juror's sentencing decision and not beyond a reasonable doubt and (2) mitigating circumstances do not need to be found by all members of the jury in order to be considered in an individual juror's sentencing decision." State v. Kleypas, 272 Kan. 894, 1078, 40 P.3d 139, 268. The Kansas pattern instructions were then revised to include consideration (2), but-"inexplicably," as the court noted in Gleason -not consideration (1). 299 Kan., at 1193, 329 P.3d, at 1145. The Kansas Supreme Court reiterated the two requirements for any jury instruction in 2008, see State v. Scott, 286 Kan. 54, 106-108, 183 P.3d 801, 837, and the pattern instructions were finally changed in 2011, see 299 Kan., at 1193, 329 P.3d, at 1145. But Gleason and the Carr brothers were tried in the 10-year delay between the Kansas Supreme Court's initial admonition and when the jury instructions were finally edited. The Kansas Supreme Court's opinion in Gleason may have rested in part on a "broader Eighth Amendment principle," but it also rested on some lower courts' failure to give instructions reflecting the Kansas Supreme Court's "repeated recognition of the required content." 299 Kan., at 1195, 329 P.3d, at 1146, 1147. Given this context, the Kansas Supreme Court's decision is particularly unlikely to undermine other States or the Federal Constitution.
The same goes for the severance question. The Kansas Supreme Court's decision depended on the "especially damning subset" of the aggravating evidence presented that may not have been admitted in a severed proceeding under Kansas' capital punishment scheme and evidentiary rules, such as evidence that one brother was a bad influence on the other. Ibid. But the difference between a joint penalty phase and a severed penalty phase may be of limited significance in States where the same evidence may be admitted in joint and severed proceedings. Cf. Brown v. Sanders, 546 U.S. 212, 217, 126 S.Ct. 884, 163 L.Ed.2d 723 (2006) ; L. Palmer, The Death Penalty in the United States: A Complete Guide to Federal and State Laws 137 (2d ed. 2014). It thus seems to me unlikely that the Kansas Supreme Court's opinion would have proven instructive in other States, even though it was couched in the language of the Federal Constitution.
*651IV
There may, of course, be rare cases where certiorari is warranted in which a state prosecutor alleges that a State's highest court has overprotected a criminal defendant. These circumstances may include: Where a state court's decision in favor of a criminal defendant implicates another constitutional right, see, e.g., Nebraska Press Assn. v. Stuart, 427 U.S. 539, 547, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976) ; where a state court indicates a hostility to applying federal precedents, Florida v. Meyers, 466 U.S. 380, 383, 104 S.Ct. 1852, 80 L.Ed.2d 381 (1984) (per curiam ) (Stevens, J., dissenting); or where a state court's grant of relief is particularly likely to destabilize or significantly interfere with federal policy. None of those circumstances, and no comparable interest, is present in these cases.
The Carr brothers committed acts of "almost inconceivable cruelty and depravity," and the majority is understandably anxious to ensure they receive their just deserts. (So anxious, in fact, that it reaches out to address a question on which we did not grant certiorari at all. Ante, at 646). But I do not believe that interest justifies not only "correcting" the Kansas Supreme Court's error but also calling into question the procedures of other States.
The standard adage teaches that hard cases make bad law. See Northern Securities Co. v. United States, 193 U.S. 197, 364, 24 S.Ct. 436, 48 L.Ed. 679 (1904) (Holmes, J., dissenting). I fear that these cases suggest a corollary: Shocking cases make too much law. Because I believe the Court should not have granted certiorari here, I respectfully dissent.

The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See United States v. Detroit Timber & Lumber Co., 200 U.S. 321, 337, 26 S.Ct. 282, 50 L.Ed. 499.

I leave aside the merits of the majority's questionable distinction, though I cannot see how the jury's conclusion that the Carr brothers committed their crime "in an especially heinous, atrocious or cruel manner"-one of the aggravating circumstances found by the Carr brothers' jury-involved any less of a judgment or value call than the mitigating circumstances alleged. See 300 Kan. 1, 282-283, 331 P.3d 544, 721 (2014).